And so what we're going to do here, Mr. Beltran will have his time, then Mr. Heisle, is that how you pronounce it? Heisle. Heisle. You'll have yours, then Mr. Waters, you'll do your part, and then we'll come back for the rebuttals by the Appellant's Council. So Mr. Beltran, we'll hear from you. Good morning, and I may have pleased the Court. I'm Mike Beltran. I represent the Quartet in this matter. The Quartet facilitates genuine, unadulterated, affordable, and safe medication. Nonetheless, Gilead obtained a preliminary injunction enabling price discrimination, charging Americans ten times international prices. I want to focus on three things today. First, the Court entered an injunction against Gregory Santulli without properly determining personal jurisdiction. Two, Gilead's egregious and prejudicial delay belies its claim of irreparable harm. And three, every Supreme Court case cited by any party allows importation under the first sale doctrine. Turning to the first issue, after finding a prima facie case of personal jurisdiction based upon the allegations of the complaint alone, the Court refused to allow further argument at the preliminary injunction hearing. This was error for two reasons. First, despite acknowledging that a court shall not issue a preliminary injunction against a defendant over whom it does not have jurisdiction, the Court did exactly that without determining whether Gilead showed a reasonable probability of ultimate success on jurisdiction. Sir, where did you ever tell the District Court what the proper standard was? We said we moved to dismiss in, I believe, in February or March. We noted that we objected to personal jurisdiction in our first discovery objections, which were in early January. When we moved to dismiss on 12b-2 for personal jurisdiction, we said that we wanted to put on evidence. The Court said that the Court was going to consider evidence at the preliminary injunction hearing. The Court said the parties need to be prepared to address both of the issues and that we would be allowed to put on evidence. But what about the standard? I'm not saying that there was an understanding by either the District Court or the parties that there was ever anything other than a prima facie case. You may be right that the standard should have been a reasonable chance of success at the preliminary injunction stage, but personal jurisdiction is waivable. And I'm not seeing that you ever told the District Court what the proper standard was. Thank you, Your Honor. I don't think we waived under 12b-2. I have a whole section in my brief about that. And I don't think we waived under the preliminary injunction standard because when I stood up to give my closing arguments at the preliminary injunction hearing on April 30 of last year, I said to the Court, I said, may I be heard on Gregory Sanfulli? And the Court allowed me to go for about 15 or 20 seconds. And then the Court said, I've already ruled on that. You need to move on, Mr. Beltran. And I was trying to be a good trial lawyer. I did when a federal district judge tells me to move on. And the Court said she'd already decided that. I felt I had to move on. I didn't feel that I could argue further at that point. But the Court specifically said that it was going to entertain it at the preliminary injunction hearing. Then the Court adjudicated it just on the 12b-2 standard on the papers on the face of the complaint, the prima facie case. Well, look at page 2114 of the appendix where you're making your argument about personal jurisdiction. There's footnote 4. And you say, finding that a prima facie case of personal jurisdiction has not been made is not sufficient for a preliminary injunction. But you never say what the proper standard is. Your Honor, I think the standard is the standard for anything on a preliminary injunction, which is a reasonable likelihood of success on the merits, which is the standard that we're asserting here. And I'm sure there's something in our preliminary injunction briefing that says you have to show a substantial likelihood of success on the merits. And that's one of the four winter factors. I mean, you can do it on a rebuttal, but it would be very helpful to have a specific site to the record where you actually tell the district court that this is the standard we want you to apply. I'm going to look for that. I thought I understood the Court to be saying that I said that in a footnote in my brief. Well, your footnote says a finding of prima facie in personal jurisdiction is not sufficient. But you don't tell the Court what is sufficient. Oh, okay. And so the answer to that, and I think in the we say that the personal jurisdiction is one of the elements that you have to show a substantial likelihood of success on for a preliminary injunction. And that was what we briefed in the we obviously told the Court. The Court knew it was standard. I don't want to take all your time up on this, but when you come up for rebuttal, it would be helpful if you could give us a specific site to the record where you do that. Thank you, Judge. Can you just on personal jurisdiction, can you just tell me sort of practically why this matters? Because I understand it's important as a legal question, but am I understanding right that you're not disputing personal jurisdiction over Mr. Santulli's companies? They can be bound by the injunction, and the only question is whether Mr. Santulli can be bound personally? That's what we've raised on appeal. Okay, right. And why does it, just practically speaking, what's at stake here as long as the companies, why does it matter? Well, personal jurisdiction, personal liability, we're a small company. So you think liability follows the jurisdictional holding? Because I would have thought those were different questions. I actually think they do. Perhaps I misspoke, but they, well, first of all, they're holding, so Mr. Santulli is personally enjoined. Not that he would, but he couldn't go and work for another company. He couldn't go, say his company falls, or he merges, or he's acquired by another company. He can't do something with some other company that's not been sued by Gilead. I'm sorry, so it's not that he couldn't work for another company. He can't import. He can't engage in the same kind of conduct that the district court found was likely to constitute infringement somewhere else. Correct, Your Honor, and he couldn't do it in Florida, or he couldn't do it in California, which is another issue. I don't think we've sharpened that for appeal, but, for example, Florida has a PDMP. RFK Jr., the HHS secretary, could say tomorrow, the governor of Florida could say, tomorrow we're going to start importing for 23 million people, Florida Medicaid, Florida Employees' Health, millions of lives there. And if he's enjoined from that, then this court's district court opinion here on trademark law would prevent our implementation of 804 and the Florida PDMP program. Right, the companies couldn't do it, but at least you're saying- Mr. Santulli could create- Continue to engage in the infringement. Could create Florida Importation, LLC, or whatever you want to call it. Again, not that he- I'm not sure which way that cuts, but okay. So the second issue on personal jurisdiction is the finding that the prima facie standard had been satisfied. That was itself error. The district court found that Santulli was subject to personal jurisdiction based upon corporate acts. It's about 75 to 100 people. Based on what? Based on corporate acts.  Based upon other people in the businesses making phone calls, based upon our suppliers drop shipping, I guess as here into Maryland, based upon things that he didn't personally do. And when you look at the personal jurisdiction cases that the appellees have cited, you see that it's like a two-man operation, or it's a one-man operation, and somebody's personally selecting merchandise and putting the stamp on the package themselves and shipping it in the mail and those sorts of things. And those facts are not alleged here, and they certainly haven't been proven. So in your view, it's not enough the district court applied the wrong standard. It's not enough that he's actively directing and supervising his own company's activities. There would need to be something more specific? I don't think that would be sufficient. I don't think generally that he owns the company. The district court said it's not just that he owns the company. It said he is actively directing and supervising their activities. That's what the district court said. I respectfully disagree. What do you think the standard should be? I think the standard needs to be for personal liability, not for corporate liability. Not for personal liability, for personal jurisdiction, because I think probably you want to keep those two things separate. I think I do. Thank you again, Your Honor. But I think that the issue is that the person themselves needs to be doing something. At some point, say you're the CEO of ExxonMobil. Are you now subject to personal jurisdiction for everything that happens in every country around the world, for every drilling accident just because you directed it? At some point, there needs to be corporate shield doctrine and the idea that the personal individual – we have corporate shield doctrine. We have limited liability. That's part of our legal tradition and our business culture here in the United States. And at some point, that evaporates if every CEO gets sued over everything personally everywhere. So I think that's the standard. I can go into moving force. I talk about it a little bit in my briefs, but I think I've given the court and my time is running short here. I want to talk about delay, if I may. Gilead knew about importation generally for years, and it knew of the specific importation here by February of 2024. By March of that year, Gilead knew the FDA would not intervene. Their contact at the FDA said, we're not going to do this. There's no patient harm. We're not going to get involved. The next nine months of Gilead's ten-month delay is completely unexplained. And the opinion rendered by the district court ignores that timeline. It just sort of finds it. I thought there was representations or evidence from Gilead that that's the period of time they took to do their due diligence and put together the specifics of the case against your clients. And that was the representation from Gilead, but we didn't get any information about that. We asked about it repeatedly. They shrouded it in attorney-client privilege. And all the case law says that you don't get to use attorney-client privilege as a sword and shield. You can't say, hey, we were working really diligently for nine months, but we're not going to tell you what we did because it's attorney-client privilege. It's one or the other. If I were Gilead and I waited ten months, frankly, I would have waived the privilege, but they decided not to. And so I don't think they get to rely on the counsel at investigation. And then the other problem that we had was the court focused the analysis on the latches affirmative defense rather than on Gilead's affirmative burden to demonstrate irreparable harm by competent evidence. And they shifted the burden to the court. The trial court shifted the burden to us to prove an affirmative defense at the PI stage rather than requiring Gilead to prove diligence consistent with their claim of irreparable harm. Well, don't they get a presumption of irreparable harm if they show infringement? There isn't. It's a rebuttable presumption, and they've rebutted it by waiting ten months. If these patients or their reputation or their bottom line or whatever irreparable harm they're claiming was so bad, Their own acts rebutted the presumption. I'm sorry, Your Honor? Their own acts rebutted the presumption. Well, you don't get to claim irreparable harm and then I waited ten months. I mean, it's completely inconsistent with irreparable harm, and at some point that is a rebuttable presumption. If ten months delay in a case like that, these are some of the best lawyers in the world. They're extremely efficient. I said that in the trial court. I think they could have gotten it done faster than ten months. But the trial court disagreed, right? Isn't there a specific finding that, no, this was a reasonable amount of time? You want us to reverse that as, I guess, clearly erroneous, abusive discretion? I would like to tell the court the thing that I think was the most erroneous, was the court said that we failed to deduce any prejudice from the delay. One of my clients, a four-year-old Rx meds, was founded by a man named Anwar Ladani. He dies in September of 2024, three months before they file suit, seven months into their delay. And we had a really hard time. His son takes over the company. His son is about my age. He's trying to piece together what dad did. He wasn't involved in the company until dad dies. And we're at depositions and we're trying to do document productions and we're looking at emails where people are arguing about what could, should, or would have happened. And it took us months to piece together things and to rebut allegations that they were making because we didn't have a good historian. And we're going to have that prejudice ongoing unless we can piece it together. And there was a lot of guesswork, frankly. When I was at the preliminary injunction hearing, I had my corporate rep there. And if I asked him what his dad did, I would draw a speculation objection. And the court sustained that. So we had a really hard time piecing things together. And that's exactly why you have latches. That's exactly why you have a statute of limitations. That's exactly why you impose a diligence requirement on somebody who's moving for a preliminary injunction, which is this court and every other court has recognized is an extraordinary remedy. It's to be granted very sparingly. The rest of the issues we raised, the court also didn't really consider below. The court really disregarded Gilead's burden to establish each winter factor. For example, the track and trace system abroad is just as good in the United States. The court disregarded its existence. Another, I think, fundamental error was John Doe never testified before the court. The court finds consumer confusion based upon the fact that John Doe inquired or he went to his doctor, he brought the medicine to his doctor, and there was some kind of inquiry. It doesn't show the confusion. They didn't call him. We didn't call him for good reason. Can I ask you a question about consumer confusion? Because I was wondering whether the district court's John Doe finding was superfluous. As I read our cases, and maybe especially Shell, it sounds like we're saying, look, if we assume for a minute the district court was right that these were not genuine medications, that they were materially different or had different quality control, that's it. That's enough to establish the necessary likelihood of consumer confusion. Do you think our cases require more than that? I think, actually, the Fourth Circuit itself has not decided a material differences case. I guess that's not what I'm asking. If these were not genuine medications, I read our cases as saying that by itself establishes a likelihood of consumer confusion. And I'm asking, do you agree with that or do you think on top of that there needs to be actual evidence of actual consumer confusion? I think there does have to be actual evidence. I think that, in fact, there was one case where they denied a preliminary injunction, by the way, for lack of a consumer survey. So I do think that they need to say what would a reasonable consumer, what's the likelihood someone's going to be. . . In a gray markets good case where they had established these were not genuine goods? Be candid with the court. I don't recall the exact facts of the case. But there were cases. I think they need to establish that a reasonable consumer is likely to be confused. I feel like our Shell case says that that follows from the importation of goods that are not genuine. Well, Shell was. . . That's kind of the whole point. I take Shell to be a quality control case, which is a completely. . . Fine. Then that is established by the importation of goods that are not genuine because they are not subject to the mark holder's quality control system. We have clearly adopted the quality control. I believe the court has in Shell, and I would distinguish Shell because that was. . . The court specifically found that there was a likelihood of contamination due to moving fuel between tanks in that case. Whereas here, these are triple packaged medicines. They're manufactured. I guess I would push back respectfully, Your Honor, on the assertion that this is not genuine. This is genuine. I wasn't asserting it. I'm really just trying to figure out your understanding of the law. If we assume hypothetically these are not genuine goods because they were not subject to Gilead's quality control systems, is it necessary on top of that to prove to show some additional evidence of consumer confusion or is the fact that they are not genuine because not subject to the mark holder's quality control system, is that sufficient by itself to establish the necessary likelihood of consumer confusion? I don't think it's sufficient. I think they have to prove these facts, these differences, then they have to prove that they're material, and then they have to prove that they would—consumer would care. I think that's what material means. And then they have to prove that there's a likelihood that the consumer would be confused. Well, what about the language differences? Why isn't that significant evidence in and of itself? Well, because we would put the inserts, the FDA inserts, we would print them out in English and put them in the packets and the consumers would get those. So they were getting those. Right, but there's also Turkish. There was also some Turkish language on those particular bottles. Yeah, so why wouldn't that be per se evidence of confusion? Because I don't think you could possibly be confused if I get something in Spanish or Turkish or Arabic, I'm going to look at that and know it's not English, probably be able to tell what language it was from the context, and I'm not going to be confused. I'm going to know exactly what I'm getting because I know I'm importing because my clients tell people that they're importing and they have to opt in or they have to accept this product or accept this program. Your time is fleeting, but can you cite for us a case in this arena where after showing the material differences, and I don't think any court has declined to accept the material differences doctrine or the quality control, that either or both of those was proven, what court has required in this context additional evidence of consumer confusion? Well, I think in some cases that the differences are. You got a name? I'm sorry? You got a case name? I think I've cited a string of cases in my brief for where the material differences, it was a gray goods case, if you will, and the court either didn't apply material differences and there were differences, but they were obvious differences, and therefore there wouldn't be consumer confusion. All right. Thank you very much. You've got some rebuttal time. Thank you. If I'm remembering correctly, it's Mr. Hessel. Correct. Thank you. Come on up. Good morning, and thank you for affording us the additional time today. May it please the court. The threshold question here as to Maritain and Proact is what type of knowledge is required for contributory liability under Inwood? The district court believed that Maritain and Proact's general knowledge on international sourcing by carve-out vendors was sufficient, regardless of whether they knew that any carve-out vendor was infringing Gilead's trademarks by importing foreign Gilead drugs that differed from their domestic counterparts. I thought both Maritain and Proact were paying their bills. They were paying invoices that were sent to them from vendors that were engaged in international sourcing, but that didn't put them on notice of trademark infringement, either as a legal matter or a factual matter. So I understand what you're saying, and I think what you just said, legal or factual matter, made me realize I'm not sure I understand exactly your point. Is it that you're saying in addition to knowing about the international sourcing, they had to know that these were not genuine Gilead products, that there was a material difference? Or are you saying they had to know that, and also they had to know that if you engage in unauthorized importation of non-genuine goods, that counts as trademark infringement? That's both, Your Honor. Why would they have to know that what they're doing is illegal? Nobody else has to know that what they're doing is illegal for liability to attach. I think that's clear from the case law, both the common law and the cases that give rise to the Inwood's contributory liability standard, the cases from this court and others that have applied the Inwood contributory liability standard, and also patent and copyright cases on contributory liability. So you don't think you could charge a company like Maritain with constructive knowledge that if you engage in unauthorized importation of non-genuine goods, you have an infringement problem? I don't. I think they have to be put on notice, or there has to be evidence that they're aware of trademark infringement. And I think this comes from the common law, number one, from the common law on which contributory liability is based, under which in order to be liable for the tortious conduct of another, a person had to know that the other person was committing a tort. And this is reflected in Section 876B of the second restatement of torts, which says that liability for the conduct of another requires that the person know that it was a breach of a duty and that that person provide substantial assistance. What about the information in the record from the Maritain employee who notified the director of pharmacy management that there are grave concerns that we are doing exactly what we said we would not do here? And he replied, that's exactly what it is, an invoice for internationally sourced meds. That tells me there's some knowledge there. So, Your Honor, Maritain had a longstanding policy of not engaging in international sourcing and not providing services to vendors that engage in international sourcing. This report said that it favored its client relationships over compliance with this espoused no international sourcing policy. Right, Your Honor. First, we disagree with the characterization of Maritain's adherence to its policy on international sourcing. But the important point is that policy... Well, its own pharmacy manager subsidiary had a marketing campaign that said it was a myth that Maritain does not provide international sourcing. If you look at that particular document, which is at JA 6167, there's actually a series of bullet points that follow that statement. And the first one recognizes that self-funded health care plans can work with entities that provide international sourcing. Maritain can't control what an independent self-funded health care employer plan decides to do outside of Maritain. And the remaining five bullet points there are all about why Maritain doesn't offer international sourcing and why it has safety concerns about international sourcing. But I want to make an important point here, which is that... Well, so many things in life come up saying and doing aren't exactly the same thing. I think I want to get through an important point, which is that Maritain's policy on international sourcing arose from a concern about patient safety and its ability to know whether imported drugs complied with the FDA's personal importation policy. And Maritain didn't have insight into that. So it was not a trademark concern that prompted that policy. And the case law is very clear that parties don't have affirmative duties to police trademark infringement absent knowledge that there's some trademark infringement occurring. And this is clear from, again, I was earlier referring to the case law applying the Inwood Contributory Liability Standard. You see in every one of those cases that recognizes even the possibility of liability, the alleged contributory infringer is put on notice. What about the evidence that Maritain was paying invoices for these internationally sourced drugs from Cana RX and that it knew about letters from the FDA saying, well, you can't do that? Actually, I think the letter is about my client, Proact. But, again, that is about... Aren't you representing both of them? I am arguing on behalf of both of them, but I just wanted to clarify as a factual matter. But, Your Honor, I think even if you don't accept that they had to have legal knowledge of trademark infringement, again, we think this is clear from all the cases where the parties, the contributory defendant receives a cease and desist letter or some other equivalent form of notice. I'm sorry, I'm just, I mean, I learned in law school. You're saying that Maritain was not on constructive notice, putting to one side actual notice. We can't charge a company like Maritain with some kind of constructive knowledge of trademark law? No, I don't think so. This is a, I mean, first, this is a niche area of trademark law, which on a theory that I understand has been adopted by most of the federal circuits, but the material differences doctrine hasn't been adopted by this court. But even in traditional, the court, and the district court itself recognizes the J3311. This was an uncommon type of infringement cases. But even in the traditional counterfeit cases, like Fonavisa, for example, that was an auction house case. The court noted that the auction, excuse me, not an auction house, a flea market. The court noted that the flea market operators had received a letter from the sheriff's office about counterfeiting. Right, lots of cases involved cease and desist letters, but I couldn't find any case saying you can't proceed without a cease and desist letter. But is there a case out there saying that that is necessary, there can be no liability, unless a trademark infringer is put on actual notice by way of a cease and desist letter? No, it's not that the cases require a cease and desist letter, but they do require that the alleged contributory infringer be on notice of trademark infringement. And that's, the Second Circuit said in Tiffany v. eBay, it's a heavy burden to me. And so it's hard to present that evidence outside of something like a cease and desist letter, or, for example, in 1-800-CONTACTS, the complaint itself. Go ahead, Your Honor, I'm sorry. No, no, no, you go, I'm sorry, I've taken up all your time. But the other point I want to make is, and if I could make one more point on the legal knowledge requirement, if the court looks to patent and copyright law, which, of course, has the same common law origin as contributory trademark infringement. The Supreme Court said that patent and copyright law are significantly distinguishable and not applicable in the trademark context. Well, it actually said, Your Honor, in Stoney v. Universal, at footnote 19, this is page 439 of that opinion, that the Inwood trademark standard is actually narrower than the copyright standard. And as I'm sure the court is aware, the Supreme Court's recent decision in Cox v. Stoney, excuse me, yes, Cox v. Stoney, said that even knowledge of infringing activity was not enough. I mean, in that case, Cox received over 100,000 notices of infringement from IP addresses, and the Supreme Court said, No, that's not, just having knowledge is not enough. You need to have the intent for the other party to infringe, either by providing a service that's tailored for infringement or through affirmative acts designed to make the infringement occur. So it's clear that, and the other point that the Supreme Court made in Cox that I think is pertinent here, is that when contributory liability has not been expressly codified by Congress, as it has in the Lanham Act, that the court is going to be loathe to expand the scope of liability beyond its precedents. So, and for that reason, in Cox, the Supreme Court hewed closely to its patent precedents in construing the knowledge and intent required for contributory liability. So we have that same thing here. And if you look to the patent cases, the court has squarely held in three different cases that knowledge of the conduct alone is not enough. You need to have knowledge that the conduct is infringing, and that's aero manufacturing. So in what cases has the Supreme Court used patent and copyright law to apply trademark law? Well, actually, in the oral argument in the Cox v. Sony case, Paul Clement was asking the court to adopt the Inwood standard in that copyright case, and there was a lot of discussion about the shared common law origin of these tests. Well, that's interesting, but what I'm looking for is a Supreme Court case that pulls from patent and copyright law to determine trademark law. Because my understanding was they were keeping them fairly separate. Well, the one case that I'm aware of is what I referred, Your Honor, to earlier, which is in Sony, the copyright case, where it referred to the Inwood test and basically said if we were applying the Inwood test, we wouldn't even be here because there's no evidence that Sony was continuing to supply its product to known infringers or that it induced any infringement. And it recognized that Inwood was a narrower standard than the copyright standard. So the Supreme Court has, in a copyright case, referred to the Inwood trademark standard and said that it's narrower. But even if the test is whether we knew as a factual matter that importation of Gilead drugs that differed in packaging and labeling from their domestic counterparts was sufficient, that standard is not met here either. Gilead has presented evidence of only one instance of importation involving a drug with packaging and labeling differences from its domestic counterpart, that being the Victarvi imported from Turkey, John Doe's Victarvi. And there's no evidence that Maritain or Proact knew anything about that until this lawsuit was filed. And we wouldn't have any basis to know anything about that or any other instance of international importation because neither Maritain nor Proact are involved in international importation. That's not part of the services they offer. They have no visibility. Where did Rx Valet and Affordable Rx get their patient information from so as to make the decision? I guess it was actually Proact that rejected John Doe at the pharmacy. And Proact then supplied further information to Rx Valet. Didn't Maritain supply the information to Proact about the client, about the patient, so that the computer would know that when he shows up with a prescription for whatever this drug is, that he couldn't get it filled with the American-made drug, that he had to go through this alternative route? Weren't they supplying the information to make that decision? And if I could address that, and it goes to another argument we have, which is that Gilead hasn't shown that we have control and monitoring over the means of infringement. The way this data stream works is that the— Why do you need that? What's that? Why do you need that control? Because as a service provider, if you don't have some additional limit on liability, you could loop in, as contributory infringers, all manner of service providers. The power company provides a service to the direct infringer. Right, but where do you get from Inwood this direct control argument? Inwood does not have that requirement. That's something courts, in particular the Ninth Circuit, has adopted again to impose some limits on liability when you're dealing with a service provider, because Inwood specifically dealt with a product. Right, but what's the—I mean, you had two cases, one from the Seventh and one from the Ninth, I'm aware of, that in a flea market context, they look to the restatement of torts to apply landlord-tenant law, which had within it a control element. And then you have these other couple of Ninth Circuit cases that, to me, just seemed like to pull the direct control element not from Inwood but out of thin air. And I just don't see the connection to Inwood, which is our lodestar in this area, to any type of a direct control argument. Right, but I think the reason you have to have that additional element that Inwood doesn't have is because Inwood is a product case, right? It was a generic manufacturer, drug manufacturer, providing the product to pharmacists. I mean, what difference does that make in services? Because, as I mentioned earlier, Your Honor, if it's just that you provide a service to the direct infringer and you have knowledge of the infringement, you could loop in all kinds of service providers and make them liable. And I think this is what the court was dealing with in Cox. Again, just because you provide Internet service and you know someone is infringing, that can't be a basis for a liability. There has to be some additional limitation. And so the two bases that the district court found over which we had control of the means of infringement, providing patient eligibility data, that's just like the routine routing services at issue in Lockheed. The payment of invoices, Perfect Ten is exactly on point with that. The infringement has already occurred at that point. The invoices don't give us any information about the infringing medications, and the clients can and do pay the invoices directly. So even if we paid no invoices whatsoever, the direct infringers could still be paid. All right. Thanks very much. You've got some rebuttal time. So now we'll hear from Mr. Waters. Thank you, and may it please the court. Timothy Waters on behalf of Gilead. There's a lot of issues that have been raised on appeal. I'm very happy to take the court's direction. I can respond to a handful of issues that were raised by my colleagues. One, just a factual point. John Doe did not receive English language instructions with his Turkish Bektari. The quartet's point on that is that Pharmacy Checker, the website that they use to make the standards they say for the pharmacies they use to import the medicine, is supposed to require them to insert these English language inserts. I don't think it matters because it's still materially different, but John Doe didn't receive the English language inserts, and, in fact, no defendant in this case had any idea where John Doe got his Bektari from because it was bounced from provider to provider to provider to finally a random Turkish pharmacy that mailed this medicine directly to John Doe's house. So the idea that there's somehow it can be cured by printing out of English instructions is just contrary to the facts of this case. Now, this case is about Americans who get their health insurance through their jobs, and they go to the pharmacy like John Doe did. They try to get their Bektari filled, as they do every month, because they need this medicine to stay alive and they need to take it every month to stay alive. And then they're told your insurance isn't going to pay for this. Call PROACT. PROACT says you have a choice. You can pay full prices if you have no insurance at all, or you can call RXLA. When John Doe goes to the pharmacy with his prescription for this and he's told you have to call PROACT, how does the pharmacy get that information to tell them that? PROACT, using the information PROACT and also Meritane when it acts as a PBM because Meritane plays both roles, the administrator and the PBM. So the PBM in this case with John Doe PROACT. Meritane was not the actual PBM for this John Doe. Not for John Doe. It was the administrator. So Meritane had what it called the source of truth feed, the information that you need to be able to identify this patient on this insurance plan. That was provided. Meritane provides that to PROACT directly. PROACT, using that information, flips a switch for anyone on John Doe's plan. For Biktarvy specifically, for Genvoy specifically, my client's drugs, if someone comes in and tries to fill this prescription at a U.S. pharmacy, deny it. And that information comes from PROACT, and identifying the patient where that flip has been switched, that's the source of truth feed that comes from Meritane. And then when John Doe was told you can't get your life-saving medicine, your insurance not covering it, he called PROACT as instructed. The record shows that if the patient is called, PROACT reaches out directly. And then there is a direct referral to an illegal importation vendor. In this case, it was RxValet. So does Meritane have information in its records that it would know that John Doe's employer has carved out this drug from its normal plan? Absolutely. So there's a few levels of knowledge here. First of all, Meritane at one point stopped working with PROACT because it knew PROACT was illegally importing drugs, and then it let them back in. But also there's record evidence of Meritane receiving and paying invoices that say, Gilead-branded drug, international, and even, look, the price of this drug is half the price, less than half the price of an authentic U.S. drug. And the district court found that they paid those invoices knowingly and intentionally and repeatedly, and they did it as a client service in order not to lose those clients. And you have to remember, this is a medicine that you have to take to stay alive every month. And so if you have someone who's filling their Bictarview once and you're paying the invoice for that international Bictarview once, you're going to be paying it again and paying it again and paying it again because these are by design maintenance medications. PROACT advertises that the way you participate in our program is it's a maintenance medication. It doesn't cure you. You have to keep taking it. There's no generic version of that medicine available, and you'll get it sent to you in the mail internationally. So if you even have just one invoice, and the district court said the totality of the evidence shows they did this over and over repeatedly for specific clients, if you're paying one invoice, you know you're going to be paying the next one. And there are actually specific findings in the record of Maritain's getting caught doing this. They said, well, we're in the middle of a planned year. We don't want to disrupt the client. We're going to keep doing it. So they absolutely had specific knowledge of specific acts of infringement. The invoice right there said international Bictarview. And as the record shows, Maritain advertised to its own clients the material differences between international and domestic branded drugs. So under the Inwood standard that requires the specific knowledge of a specific infringer, we have repeated record evidence of actual knowledge and actually doing it. As I understand your colleague's position, I think they're saying even assuming, I don't think they agree, but even assuming there was actual knowledge, sort of unauthorized importation of a non-genuine product because there was specific actual knowledge that these were not FDA approved, they had different instructions and warnings, that that's not sufficient unless you can also prove that they knew that when they did that, that was a trademark infringement violation. What's your response to that? I have a number of responses to that. I'll start general and try to get more specific. As an example, Bryan v. U.S., 524 U.S. 184. That's the Supreme Court addressing very narrow circumstances that are exceptions to, quote, the traditional rule that ignorance of the law is no excuse and that require the defendant to have knowledge of the law. These are complex tax cases, financial cases. Obviously, it is a baseline rule. Generally, ignorance of the law is not an excuse. I would say this Court's decision in Georgia-Pacific, which is your first pronouncement on contributory trademark liability, that case, this Court was very specific. This is the analytical journey you go on for contributory infringement. The first stop is Inwood Labs. That case was the branded paper towel case you may remember, Judge Keenan, where the plaintiff had a branded paper towel dispenser, the defendant made generic towels to be inserted into that dispenser. The alleged act of infringement was the stuffing of the generic towels into the branded dispenser. That's what turned them infringing. This Court said under Inwood Labs, you look to see if the defendant had knowledge that that stuffing, the act of a third party that rendered it infringing, had occurred. No discussion of did the defendant have knowledge or come to a subjective legal conclusion that that was infringement. In fact, this Court held the opposite. It held for that first step for Inwood Labs, you assume arguendo that that was, in fact, infringing. Did they have knowledge of the act that was occurring? Yes, they had knowledge of the act. Yes, they kept selling the product to people they knew were doing that, and then the alternative, also they induced that act. That was a paragraph in this Court's opinion. The rest of the opinion is let's look at that direct infringement and see if it's actually infringing. It was a close call. You reversed the district court on that point, relying heavily on survey evidence that was introduced at trial about consumers being confused when they see the defendant's product in the plaintiff's branded dispenser. That survey evidence wasn't available to the defendants. It didn't exist at the time. The question of knowledge ends with Inwood Labs, and it ends with do they know about the infringing act? To say that they have to subjectively know that it is trademark infringement, especially on this record, is a bridge way too far. Maritain is owned by CVS Caremark. They had a team of corporate lawyers looking at this issue consistently because their salespeople and their executives kept trying to go around and did go around the legal department, which told them this is illegal, it's a crime, it's dangerous for patients. Heck, we advertise that people can die from this, so you can't do it, and Maritain kept doing it anyway. For them to stand up, and when Maritain took the stand at the preliminary injunction hearing, he readily agreed with me that all the importation that its vendors are doing is illegal. For them to stand up and say I know it's illegal, I know it endangers patients' lives, I know it's a crime, but I didn't know all of the laws I was breaking, I didn't realize it was also violating the Lanham Act, I think is a bridge too far. In my practice where I deal with counterfeit pharmaceuticals, a common fact pattern is there's a counterfeiting ring, there's a leader of the ring who provides the supplies to make the counterfeits, but he doesn't touch them himself. Here's how you make the counterfeits, go do it. He's a classic contributory infringer. He is scared about going to jail. He is very secretive, but he has no idea what the Lanham Act is. He's a street-level criminal. He's not brushed up on his trademark law. Under their proposed reading of Inwood Lambs, I would be unable to go and get an injunction against that intentional counterfeiter to stop him from supplying the counterfeits. I would be unable to prove that he has knowledge that he was committing a tort under the Lanham Act as opposed to doing something wrongful and illegal. And to have that kind of outcome, you would want a very specific holding, I think, from a court saying that part of my burden as a manufacturer, as a markholder, is to prove they had subjective knowledge of the Lanham Act. And there's not a single case that has come close. And by the way, I can't get the—they're not saying they didn't know. They're saying Gilead can't prove it because I would have to ask them, what did your lawyers tell you about the Lanham Act? And I can't ask that question because it's privileged. So I don't think that requirement is anywhere in the law, but I think Judge Harris, you're also right at absolute minimum when you know that it's materially different, when you know that it's illegal, when you have a team of lawyers looking at it, you're on constructive knowledge. I think all the parties here agree that willful blindness, constructive knowledge, knew or should have known. That's the Inwood Lab standard. I think that's very easily met on the record here. I'll point out some other facts. ProAct actively partners with this company, CanRx. It has advertisements that are in the record that refer to it as ProAct's international importation program. ProAct actually worked with CanRx to develop its formulary, meaning these are the drugs that are going to be rejected at the point of sale, and you have to get them if you want insurance to pay for it. You have to get them from the importation companies. And both Meritane and ProAct were found to have advertised to their clients that you can get your drugs through illegal importation programs and to have actively referred their clients to their preferred illegal importation vendors. Is CanRx the one that got the letter from the FDA? That's correct, Your Honor. And both ProAct and Meritane said that they knew about that letter, had read it. And, again, that letter listed many of the material differences and named specifically Gilead HIV Medicine as among the medicines that are dangerous to import and that are materially different from the domestic versions. And so they clearly had the knowledge of the material differences. They were targeting Gilead drugs specifically. They're getting invoices that listed the brand names of Gilead drugs. And the district court made repeated findings that this was an intentional system by them in order to try to get insurance companies to buy and pay for these illegally imported drugs rather than paying the full price for authentic domestic drugs. I'll also point out that in terms of Cox Communications, that inducement standard, did you refer someone, did you advertise the infringing use, that was left untouched by the court. So while I agree with Your Honor that in Sony the court made very clear copyright and patent have this historic kinship, they're both limited government monopolies to protect the original works of authors or inventors, the court said we've always held that there is no such kinship between copyright and trademark. We have a string site in footnote 19. And so it said we are not going to look to Inwood Labs to determine what the contributory infringement standard should be for copyright, and we're not going to touch, we're not going to revise Inwood Labs. They are definitely on separate tracks. And Inwood Labs, again, has always required that specific knowledge of a specific infringer, and the district court found that here in spades. On the personal jurisdiction issue, just to raise a couple of points there, I do think the district court in making specific findings that Mr. Santulli, by virtue of his close supervision of the company itself, that he personally supervised and personally ratified the sales of these products, including illegally imported products into Maryland, like John Doe, was sufficient at a prima facie case stage. I'll also point out that we submitted significant record evidence in opposition to that 12b2 motion that the district court didn't get to because it said the pleadings was enough. And the district court at the PI stage made specific findings on Mr. Santulli's close supervision of the company, the fact that he personally the prima facie standard as opposed to reasonable success? At the preliminary injunction stage, Your Honor, or at the 12b2? Yes. At the preliminary injunction stage, again, this issue wasn't raised before the district court. I think you're right. The district court wasn't told what standard to apply. It was never raised that the district court needed to apply anything other than a prima facie standard. But this court can, even if there's no waiver, this court can obviously affirm on any basis that's supported by the record. And the district court made specific findings. Well, if, assuming, if the district court had been told you are using the wrong standard, you have to find reasonable success here, not prima facie, and the district court went ahead and found only on a prima facie case, would that have been a rightness? If the district court applied a prima facie standard, which I don't think the district court did, and there were not sufficient evidence in the records and the court's findings to support the higher standard, the correct standard, then that would be erroneous. But here the district court did make factual findings that do support the correct standard. And those are the factual findings. The court didn't say it was for preliminary injunction or for likelihood of success. A lot of them overlap. Well, did they need to? If the court wasn't told of the standard and all that was represented in the report was to use a prima facie standard, was there error to do that? No, Your Honor. As Your Honor pointed out, personal jurisdiction is an eminently waivable offense. If the issue wasn't raised below, I think it's not fair to the district court. It's kind of a gotcha game. And it wouldn't be fair to raise it for the first time on appeal. And I will point out that despite all that, and putting all that aside, the district court made specific findings that Mr. Santulli personally approved all the payments for the internationally imported medicine, including the one that went to John Doe. Mr. Santulli personally signed the contracts, including with the employers that he knew had employees in Maryland that were receiving these drugs. Mr. Santulli held the welcome calls, the onboarding calls where he described the program. And, of course, again, this is maintenance medicine, medicine you need to take every day to stay alive. So there wasn't a one-off sale to John Doe. The intent was to continue supplying John Doe with the medicine he needs to take every day to stay alive for as long as he's with his employer. And John Doe wasn't the only person in Maryland. So I think we certainly have more than sufficient evidence on a preliminary injunction standard, which everyone applies, to find that he directed activities personally, in his personal capacity, through the signing of contracts, through the approval of payments, and also through the hiring of a pharmacist who he made sure had licensure in the states he wanted to sell into, including Maryland, because you can't accept prescriptions from a Maryland doctor and send drugs to a Maryland patient unless you have that type of licensure. So I think the findings of the factual court and the record that we put in our briefing is more than sufficient to find, especially at the preliminary injunction stage, that Mr. Santulli purposefully availed himself of Maryland and took personal acts directed at Maryland, consistent with due process and the long-arm statute. On the 12B2 motion, I do just want to put a pin in the idea that obviously that is not normally appealable. I think the argument, so the Supreme Court in the Swint decision said there's two ways in which a normally unappealable decision can be reviewed on an interlocutory basis. One is the inextricably intertwined standard. The other is you can't meaningfully review the normally reviewable opinion unless you bring in the normally non-reviewable opinion. I think that second one clearly does not apply here. This court reviews preliminary injunctions all the time. And the inextricably intertwined standard, as the cases that both parties have cited stands, that's, for example, if there's an issue you have to go through administrative exhaustion before you can even bring this case. That's going to affect the preliminary injunction. If there's a motion to dismiss on that standard, it's going to be the exact same thing, exact same standard, exact same facts. Same thing with qualified immunity. There's a couple of cases in that context. Here, yes, personal jurisdiction applies at the 12B2 stage and at the PI stage. But it's very different standards and very different facts. The district court didn't even get to the facts outside of the four corners of the complaint. And then by the time it got to the preliminary injunction standard, we'd already had additional testimony. Facts that weren't even available to be put into the record for the preliminary injunction. If this court were to find, I don't think it should, but if the court were to find that the district court did not have sufficient facts to meet the preliminary injunction standard for Mr. Santulli, it certainly does not automatically follow that he must be dismissed from the case. That just means the preliminary injunction doesn't apply to him. That doesn't mean that automatically the 12B2 motion was erroneous. The argument really boils down to, look, if we're talking about personal jurisdiction, we can just get rid of the whole case right now. And this court, in the Ruck's opinion, held that type of efficiency or fairness argument does not apply. The Supreme Court has very narrowly constricted what can be reviewed on pendent appellate jurisdiction. So long story short, I don't think this court should touch the 12B2 motions. I don't think it's properly before this court. If Your Honor has any questions on any other points, I'm happy to address them. I can also march through the brief. Thank you very much. We appreciate your argument. Mr. Beltran, you've got some rebuttal time. Thank you, Your Honor. Before, during my opening argument, the court asked me to point out, where I pointed out to the court, that the court had to find personal jurisdiction, a substantial likelihood of finding personal jurisdiction, and we did. It was in that footnote, the first case cited in that footnote is Weitzman v. Stein. It's a case out of the Second Circuit, and that was the case we cited, and that case says at 659, it says, On remand, the district court may not enter an injunctive order against Beverly without determining that Weitzman has established at least a reasonable probability of ultimate success on the question of the court's impersonal jurisdiction over Beverly. So we did tell them, because we cited that case. The trial court presumably read that case, and we pointed that out in our brief with a pin site. But I can do one better, Your Honor. The court told us, At 1131, in the court's order requiring briefing on personal jurisdiction, the court said, To aid plaintiffs in their response, the court shares the following concern. Inasmuch as Mr. Santulli raises a 12b2 challenge and the plaintiffs bear the burden to establish all four winter factors, including a clear likelihood of success on the merits as against Defendant Santulli, it is, it would appear, incumbent upon the court to consider Mr. Santulli's contentions that the court lacks personal jurisdiction over him in determining whether plaintiffs have met their burden on the PI motion. And the court, of course, shall not issue an injunction against a defendant over whom it does not have personal jurisdiction. But with all due respect to the trial court, the trial court did something different. Instead, the trial court adjudicated it based on the 12b2 standard. I don't think there were sufficient facts alleged or proven to support personal jurisdiction over Mr. Santulli. And perhaps, as my friend on the other side said, that's an issue for remand. But the court can also look at the record and see that there were no personal acts done by Mr. Santulli into Maryland that he did himself that would be consistent with the corporate shield doctrine and so forth. And I really think they need to prove each element. I think the court knows that. I think all the lawyers in this room know that. The trial court, that is, knew that. There were a few other places. 1385 to 1386, we said that you need to prove all issues in every circumstance by substantial evidence. 1469, trial court notes that Gilead wanted to bind the issues up at the PI hearing. That's another order issued by the trial court. And then at 1470, in that same order on the next page, the court says that Mr. Santulli might... The trial court thought that my client, Mr. Santulli, might hang his entire hat just on personal jurisdiction. In other words, that he was going to resist the preliminary injunction solely based on his preliminary injunction... Excuse me, solely based on his personal jurisdiction defense. So there was a lot of notice that the court was supposed to apply a different standard and find, by likelihood of success on the merits, that there was going to be personal jurisdiction over Mr. Santulli. And that's... I'm just going to say it. I think that's probably our strongest issue on appeal, and that's something that really does merit at least a remand. I thought about the question from the court about material differences... Your position is that, as to personal jurisdiction for Santulli, that it should go back for the district court to apply the proper standard? Your Honor, I think my position would be that the trial court record is sufficient, which is what I started saying during my closing remarks at the preliminary injunction hearing. I said they didn't put the proof in to show substantial likelihood of success. They had a two-day hearing. They had all the opportunity in the world to do that. Right, but normally, you know, we just kind of axiomatically, if a district court applies a wrong standard, we just usually send it back. I mean, we don't have to, but that's what we do in 99 cases out of 100. I would certainly understand and, frankly, be gratified if the court sent it back. I think that the court doesn't have to send it back. I think the record that I made at the preliminary injunction hearing would allow the court to find a lack of personal jurisdiction, and our motion on 12b-2 should also, frankly, have been granted. I think the court could just decide the issue, but if the court sends it back, that's certainly something I've seen appellate courts do. I thought about the material differences question, and I think part of the reason why there's not a lot of case law saying that there's confusion is because material differences are the type of things that might confuse the consumer. Here, I think the material differences were so obvious that the consumer couldn't be confused. I'm happy to submit a supplemental brief if that would please the court. I just want to say one more thing. Counsel on the other side represented that John Doe didn't receive the right information or the packaging wasn't quite right. That wasn't the testimony. That wasn't the testimony from Harpeet Dhanota. I asked her, I said, did you get the packaging? Did you ask the doctor? Did you ask the patient for the packaging? They either hadn't asked or it had been discarded, but they didn't have the packaging. We asked about the packaging. We asked about other aspects of the packaging, like cold storage, and they didn't know about that either. So that just wasn't something they were focused on. The packaging wasn't preserved. I'm not saying spoliation, but I'm saying we have no evidence that John Doe didn't get that information as consistent with our pharmacy checker and other practices. As I see my time expiring. Thank you very much. Mr. Hazel, come on up. You've got some rebuttal time. Thank you, Your Honor. On the knowledge question, I would urge the court to look closely at Tiffany v. eBay, because in that case there was evidence of rampant sales of counterfeit Tiffany merchandise on eBay, and there was evidence that eBay took efforts to stop those counterfeit sales with varying success. And the court said, well, despite that general knowledge of counterfeit sales of Tiffany products wasn't enough to make you eBay contributorily liable. You had to have knowledge of specific counterfeit sales. And the way they got that specific knowledge was through these notices of infringement forms that... Oh, okay, I'm sorry. So, right, so you're talking about the cases where they say it goes to the specificity of your factual knowledge, but those are not cases that say if you have specific knowledge that this act of counterfeit, that you are facilitating this particular person in its counterfeiting, that we also ask whether you knew that was illegal under this particular theory. Well, we think there needs to be both, but I'm not going to try and win you over on the legal knowledge. I understand what cases you're talking about. Correct, Your Honor, and this is reflected in Rosetta Stone, too. The court said just because you have knowledge that some percentage of users of your service are going to use it to infringe, that's not enough. I do think that that goes to your factual argument. I'm just excited. Thank you, Your Honor, I'm sorry. I'm overcome with enthusiasm because I understand now the point you were making, but I do think those cases go to kind of the factual side of things and do not engraft on top of that a separate requirement that you know that this specific factual thing that happened violated this particular law. And the only other thing I want to say is that I think Rosetta Stone is not a great case for you on this whole control theory because I think Rosetta Stone does talk about services and it does not... I mean, I understand that it was a product at issue, but Rosetta Stone's reasoning talks about products and services interchangeably and does not apply this control standard. So I'm not... I think I'm piggybacking on Judge Agee's questions to you before. The Supreme Court hasn't said it, and I think our case law not only hasn't adopted that standard, but in Rosetta Stone goes pretty far toward rejecting it. And so I'm not sure... But you are asking us to just adopt a standard that some other circuits have used. Yes, we think that's appropriate, but I also think that the control element is implied in Rosetta Stone because Google is hosting these ads on its website. So obviously Google has the ability to just stop running the ads. So in that sense, Google is sort of equivalent to the flea market. It parallels those cases that this control requirement... Can I just... Sorry, about the control standard. Just as a matter of common sense, I also am a little confused about its origin because it just seems to go more to vicarious liability. Like, where you really do talk about, did the defendant have control over the subordinates' acts so that you could hold them vicariously liable? I don't really see why it would be... If you were starting fresh, and we would be in our circuit, why that would be the approach you take to try to cabin the very legitimate concern you're raising about the kind of breadth of a kind of strict liability standard that if you are supplying electricity to someone who is engaged in trademark infringement, suddenly you're liable. Like, why would control be... Why would you end up with a control standard? Because I think it goes to your ability to stop the infringement once you're on notice about it, right? I mean, if you have control, then you're in a position... But that doesn't work because a power company could still turn off the power. I mean, it just seems like a very unwieldy way to get at a legitimate problem. Right, it's control over the means of infringement, though. I think you have to identify... If they're using electricity to infringe, and they probably are in this day and age. It doesn't matter. It's kind of an academic concern. But it just seems like a very blunt instrument. Understood. I see my time is running short. I do want to make a few final points, which is that when Maritain and ProAct pay invoices, I want to be clear that they're doing this on behalf of the plan sponsor client, and those invoices can and are at times paid directly by the client. There's also numerous instances of Maritain rejecting invoices for international sourcing consistent with its policy, and some of these are at 1249 through 51, 1259 through 60, 1287 through 88. And Maritain also blocks certain vendors that engage in international sourcing, including RxValet. As to our client, there's testimony at 2634 that even though they don't see or handle the packaging of any drugs and therefore aren't in a position to evaluate material differences, his understanding was that all these drugs came from Tier 1 countries and original US-manufactured packaging. If I could just make one final point, I see my time is up. I think the danger here is that if PBMs and TPAs like Maritain and ProAct are going to be liable for the use of patient eligibility data by any downstream actor beyond their control, in the vast, vast majority of the cases, this data is used for domestic drug administration. But essentially what Gilead is asking is that they should be subject to strict liability any time this is used to infringe. That's going to have significant impacts on this industry for purposes that are indisputably lawful, administering domestic drug benefits. So we'd ask the court to reverse and vacate the preliminary injunction. Thank you. Thank you very much. I'll ask the clerk to adjourn court until 2.30 this afternoon. Now we'll come down and greet counsel. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: G. Steven Agee, Pamela A. Harris, Barbara Milano Keenan